## Case No. 11,276.

### POPE v. The SAPPHIRE.

[Hoff. Op. 504.]

Circuit Court, D. California. Feb. 24, 1869.

SALVAGE—CONTRACT FOR PAYMENT AT ALL EVENTS —AMOUNT OF AWARD—VESSELS IN CONTACT— LIABILITY OF ONE AT FAULT FOR SALVAGE.

[1. A statement, by the master of a vessel to the commander of a tug asked to tow her out of danger, "that the ship would pay," is not sufficient evidence of a contract for payment at all events to bar a libel for salvage.]

[2. A contract for payment of salvors at all events, where the danger is not great and success is reasonably certain, should have little influence on the amount of the award.]

[3. Where two vessels are in contact, causing mutual damage, salvors who separate them should receive from the one at fault salvage upon the total value of the two.]

[4. When the value of the property saved is such as to justify a liberal reward to the salvor, as compared with his ordinary profits, the maximum award has been reached. It should not increase with the value of the property beyond that point.]

[This was a libel by Pope and others against the ship Sapphire for salvage.]

Wm. Barber, for libelant.

McAllister & Bergin, for claimant.

HOFFMAN, District Judge. On the 23d of November last the ship Sapphire drifted from her moorings and came in contact with the French transport Euryale, causing and receiving considerable damage. The situation of the two vessels rendered it in the highest degree expedient that they should be at once detached from each other, and the captain of the Sapphire came on shore to procure assistance. He found the steamtug Sol Thomas lying at a wharf in charge of the mate, engineer and five men. The mate at first hesitated to enter, in the absence of the master, on the service, and inquired who was to pay the tug. Capt. Boyd assured him that the ship would pay, and, after consulting with the engineer, it was determined to start. The tug accordingly proceeded to the vessels, and after some efforts, but with no very great difficulty, succeeded in separating them. He then towed the Euryale to a place of safety.

It is contended by the claimants that the conversation above detailed amounted to an agreement between the parties that the tug should be paid for her efforts or services, in any event, and without reference to her success or failure, and that the existence of such a contract deprives the service of the distinctive character of salvage service and her owners of any right to be remunerated on that basis. It is not denied that whether the service be considered a strictly salvage service, or whether it was deprived of that character by the fact that it was to be paid for in any event, the court has jurisdiction. The Emulous [Case No. 4,480]; Bearse v. Three Hundred and Forty Pigs of Copper [Id. 1,-193]; The A. D. Patchin [Id. 87]; The True Blue, 2 W. Rob. 176; The Henry, 2 Eng. Law & Eq. 564. Nor is it contended that services of this kind, even though performed in pursuance of an express contract, do not create a lien in rem. The A. D. Patchin [supra]. In the case of The Independence [Case No. 7,014], the eminent judge [Curtis] held that "a contract to be paid at all events, either a sum certain, or a reasonable sum, for work, labor and the hire of a steamer, in attempting to relieve a vessel in distress, without regard to the success or failure of the efforts thus procured, is inconsistent with a claim for salvage; and when such a contract has been fairly made, it must be held binding by a court of equity, and any claim for salvage disallowed." In noticing this case, the learned author of Parsons' Maritime Law cites it as deciding "that if a vessel be hired to do a stated service, as to tow a dismasted vessel to a place of safety, and no price is named, because the time it may take is not altogether certain, this is a salvage service, and the agreement is of no avail"; and from this doctrine he dissents, because "we are unable to see why the parties may not make a valid contract, leaving the price to be determined on the doctrine of a quantum meruit." 2 Pars. Mar. Law, 629. But the learned author seems to have misapprehended the decision in the case of The Independence [supra]. This is evident from the passage already cited, and also from the following: "When, therefore, the subject matter of the contract is a mere attempt to save property, and the owner or his representative, or both, become personally liable by the contract to pay either an agreed sum, or a quantum meruit, for the labor and service rendered without regard to its results, the parties do not contemplate nor engage in a salvage service, but quite a different service." Pars. Mar. Ins. p. 356. But the case does decide that to bar a claim for salvage where property in distress on the sea has been saved, it is necessary to plead and prove a binding contract, to be paid at all events for the work, labor and service in attempting to save the property, whether the same should be lost or saved. The service being prima facie a salvage service, it is incumbent on those who would change its character by contract to clearly apprise the party with whom they are dealing that they do not wish to engage his vessel in a salvage service, but merely that she should make an effort to find and save the vessel in distress, and that for the work and labor performed a quantum meruit would be paid at all events, whether the ship should be found or not, and whether or not the steamer should be able to do the

work. To make out such an understanding, acted on by both parties, the proofs should be clear and cogent. The Salacia, 2 Hagg. Adm. 265; The William Lushington, 7 Notes Cas. 364; The Susan [Case No. 13,630]. In this case last cited, the court says: "The party who asserts that there was a contract which displaces salvage, assumes the burden of proving affirmatively the existence of such a contract. It is not enough for him to show that there was some contract, he must go farther and prove that it was agreed that the compensation should be absolute and not contingent; otherwise the law will say it was to be contingent on the saving of the property."

In the case at bar the only evidence of a contract to pay absolutely and at all events is the assurance of the master of the Sapphire to the mate and engineer "that the ship would pay." No personal liability was in terms created. It was not stated that the ship would pay whether the efforts of the tug were successful or not; nor is it reasonable to suppose that the mate and engineer (even if they had the authority to do so) intended to enter upon the service on any different terms, or for any rate of compensation, other than those on which steamtugs usually perform such services in this harbor. On comparing the evidence in this case with that in the case of The Independence [supra], the latter will be found far the stronger of the two; and yet it was held by Mr. Justice Curtis insufficient. But the point is in reality of slight importance in the present case. Undoubtedly, the fact that the salvor's services are only to be compensated in case of success is an ingredient of merit, and justly entitles him to a remuneration greater than if he were to be compensated for his efforts whether successful or not. But the degree to which this consideration should influence the award must depend on the circumstances of each case, where the service undertaken is arduous, and must necessarily be protracted, and where it requires the risk of property and the expenditure of money, labor and skill before success can be assured. Where the chances of success are doubtful or desperate, the fact that the right to any compensation was staked upon the event, should justly enhance the amount to be awarded by the court. But where, as in this case, the service must be completed, if at all, in a few hours, where no reasonable doubt of success could be entertained, and the service differed but slightly from the ordinary business of the tug, the circumstance that an agreement was made to pay for the service at all events, as it practically gave no additional certainty of compensation to the salvor, can have little influence upon the award of the court.

The amount to be decreed to the salvors remains to be determined. The service rendered by the tug consisted in hauling away the Euryale from the Sapphire, which had collided with her. In a suit between the two vessels it has been adjudged that the Sapphire was in fault, and she was condemned in damages. The vessels were in contact but a short time, and it is evident that every moment they remained together increased the damages to the Euryale, and the consequent liability of the Sapphire. The court is asked to include in its decree against the Sapphire the amount of a reasonable salvage, which, had the Euryale not been a public vessel, might have been recovered of her, and for which the Sapphire, as the vessel in fault, would have been liable. This claim is resisted on the ground that, the Euryale not being liable for salvage directly, no indirect decree for salvage should be made against her, and the tug should be left to seek a compensation from the bounty or justice of the government to which she belongs.

I think it unnecessary to decide the abstract question whether in this case a reasonable salvage due primarily from the Euryale could, as such, be decreed against the Sapphire. But I see no difficulty in awarding to the tug in this suit full compensation for the service rendered to both vessels. Where two vessels are in contact, causing mutual damage, and no fault is imputable to either, the value of the property salved will be estimated at the sum of the values of the vessels and their cargoes, and the award be contributed for in the proportions these values bear to each other. Such was the ruling of this court in the case of The Duke of Rothsay [unreported]. But where the liability of one of the vessels for the whole damage has been judicially established, I see no reason why the salvors should not, as before, be treated as having saved property of the aggregate value of both vessels, but the salvage reward be decreed to be paid by the vessel in fault. The value of the Sapphire and cargo was $148,000 in gold; that of the Euryale from $15,000 to $20,000,—about $160,000 in all. The service of the tug was rendered at a very early hour in the morning. The means at her disposal rendered it immediately effective, and it does not appear that any other tug could at the moment have been procured to tender such prompt and efficient aid. Some skill was required, but not more than the persons in charge of such vessels are supposed to possess. The wind was violent, and the sea rough, and there was perhaps a slight risk of injury to the tug by being thrown against one or the other of the vessels. But I hardly think that this can enter largely into an estimate of the merits of the service, as it was not great, and could have been avoided by the exercise of due skill. The fact, however, that the tug did sustain some damage (being obliged, on account of the floating spars, etc., to approach the Euryale on the windward side) may perhaps be accepted as proof that the undertaking was not wholly

unattended with danger. That the strain on her was severe, is shown by the fact that she parted a hawser in attempting to detach the vessels from each other. But, except in these particulars, and in the fact that the service was rendered at a very early hour of the morning, and in a gale of wind and heavy sea, it does not materially differ from the ordinary employment of the tug. Its success was reasonably certain, and though the damage to the Sapphire was increasing every moment from the attrition of the Euryale's bows, which were "sawing into her," there seems no reason to believe that either vessel would have been totally lost before aid could have been obtained, even if the tug had declined the enterprise. In the case of The Duke of Rothsay this court had occasion to consider the principles applicable to salvages effected in or at the entrance to harbors by steam tugs. I see no reason to modify the views there expressed. The aim of the court has been to encourage by liberal rewards the maintenance of this class of vessels so essential to the safety of the commerce of our port, and to induce them by the hope of largely increased gains in case their services are required, to hold themselves at all hours of the day and night in readiness to give their aid at a moment's notice. At the same time care must be taken not to permit undue advantage to be taken of distress, nor should compensation be awarded out of all reasonable proportion to the sum for which a similar, or nearly similar, service would be rendered by the tug in the course of her ordinary employment.

In fixing the amount of this compensation, the value of the property in peril cannot, of course, be left wholly out of consideration. But, it seems to me, that when that value is sufficient to enable the court, without subjecting it to too great a burden, to give to the salvor a generous reward for his services, as compared with his ordinary rates of compensation, the maximum allowance has been reached, and it should be substantially the same, though the value of the property in peril was far greater. In other words, that the basis of the allowance should be a consideration of the danger, duration and other circumstances of the service, and of the ordinary rates charged by the vessel for similar services, rather than the allowance of a percentage or proportionate amount of the value of the property salved. In The Duke of Rothsay, the service was of longer duration, and the vessels in perhaps more imminent danger of total loss than in the present case. The value of the vessels and cargoes was far less. In that case $3,000 was awarded, and I think the same sum should be allowed in this. As I have been asked distinctly to pass upon the point, I desire to be understood as awarding this sum as a full compensation for the salvage service rendered to both vessels, and as in

full satisfaction of the whole demand of the salvors. But, for the reasons just given, the allowance has not been materially increased by the addition of the value of the Euryale to that of the Sapphire.

[For appeals in the case of The Euryale v. The Sapphire, see 11 Wall. (78 U. S.) 164, and 18 Wall. (85 U. S.) 51.]